IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARTIN BARTESCH, FRED BRYANT And JOSEPH P. CRAIG, Individually And On Behalf Of All Others Similarly Situated, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil Action No. 11-1173-RGA |
| BRENT M. COOK, MARTIN F. PETERSEN, JOHN T. PERRY, RICHARD D. CLAYTON, NICHOLAS GOODMAN, KRAIG T. HIGGINSON, REYNOLD ROEDER, BARRY MARKOWITZ, ALAN G. PERRITON, JAMES A. HERICKHOFF, and SCOTT E. DOUGHMAN, | : : : : : : : : | |
| Defendants. | : : | |

Timothy J. MacFall, Esq. (argued), RIGRODSKY & LONG, P.A., Garden City, NY; Brian D. Long, Esq., RIGRODSKY & LONG, P.A., Wilmington, DE.

   Attorneys for Plaintiffs.

Kelly M. Hnatt, Esq. (argued), WILLKIE FARR & GALLAGHER LLP, New York, NY; S. Mark Hurd, Esq., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE.

   Attorneys for Defendants.

April 23, 2013

*/s/ Richard G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

Pending before the Court is defendants' motion to dismiss the amended complaint. (D.I. 16). On November 29, 2011, plaintiff Martin Bartesch filed this putative class action against defendants Brent M. Cook, Martin F. Petersen, John T. Perry, Richard D. Clayton, Nicholas Goodman, Kraig T. Higginson, Reynold Roeder, Barry Markowitz, Alan G. Perriton, James A. Herickhoff, and Scott E. Doughman, alleging violations of the Securities Exchange Act of 1934. (D.I. 1). On March 1, 2012, this Court issued an order appointing Bartesch, Fred Bryant and Joseph Craig as co-lead plaintiffs. (D.I. 10). On April 30, 2012, plaintiffs filed an amended class action complaint. (D.I. 14). Defendants filed the instant motion on July 13, 2012. (D.I. 16). The motion is fully briefed (D.I. 17, 19, 20) and oral argument was held on September 25, 2012. For the reasons that follow, the Court will grant defendants' motion to dismiss.

## I. BACKGROUND

Raser is an energy company focused on geothermal power development and technology licensing. (D.I. 14 at ¶ 2). Defendants are former officers and directors of Raser. (*Id.* at ¶¶ 21-31). Plaintiffs are three former Raser shareholders who are suing on behalf of a putative class of purchasers of Raser's common stock between May 11, 2009 and April 29, 2011. (*Id.* at ¶ 1).

In 2008, Raser reported the completion of a new geothermal power plant in Beaver County, Utah called "Thermo No. 1," which was developed using Raser's "rapid deployment" strategy. (*Id.* at ¶ 2; *id.* at ¶ 53; D.I. 18, Ex. B at 11-12)[1]. Raser disclosed in SEC filings that,

---

[1] This Court may consider on a motion to dismiss documents "integral to or explicitly relied upon in the complaint," documents filed with the SEC, and matters of public record such as Raser's stock price. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (citations and quotations omitted).

1

pursuant to that strategy, it "target[ed] well-studied properties with known geothermal anomalies," because "the amount of time and capital for well field development and the risks associated with such development are generally reduced." (D.I. 18, Ex. B at 11, 14).

Raser began selling electricity generated at Thermo No. 1 to the City of Anaheim, California in April 2009. (D.I. 14 at ¶ 2). In its first quarter 2009 10-Q, filed with the SEC on May 11, 2009, Raser stated: "With the completion of the major construction items of the Thermo No. 1 plant, we believe we have demonstrated our ability to quickly develop geothermal power projects using our rapid deployment business model." (D.I. 14 at ¶ 51; D.I. 18, Ex. C at 12). Raser's first quarter 2009 10-Q also stated that "[w]e expect the Thermo No. 1 geothermal power plant to become operational at or near full capacity early in the third quarter of 2009." (D.I. 14 at ¶ 53; D.I. 18, Ex. C at 11). In its second quarter 2009 10-Q, filed with the SEC on August 10, 2009, however, Raser disclosed that it was experiencing "unexpected difficulties and delays in developing a well field that will produce sufficient heat to operate [Thermo No. 1] at full capacity." (D.I. 18, Ex. D at 48). As of June 30, 2009, Thermo No. 1 was producing "slightly less than half of the plant's designed capacity." (D.I. 14 at ¶ 2).

On March 18, 2010, Raser filed its 10-K for the fiscal year ended December 31, 2009. In its 2009 10-K, Raser stated that "[b]oth the gross output and the net output of the [Thermo No. 1] plant are below the amounts the plant was designed to produce, primarily due to issues related to the temperature of the resource from the well field." (D.I. 14 at ¶ 75). In June 2010, Raser undertook a further evaluation of Thermo No. 1 and concluded that while the plant's "performance may improve from the current output level," it "likely will not achieve [the] originally designed electrical output levels." (*Id.* at ¶ 91). As a result, Raser determined to

2

recognize an impairment loss of $52.5 million to the value of Thermo No. 1. (*Id.*). During the third quarter of 2010, Raser commenced a solicitation process for the sale of Thermo No. 1. (*Id.* at ¶ 101). Based on the solicitation process and its further evaluation of the performance of the plant, Raser took a further write-down in December 2010, which was reflected in its 2010 Form 10-K. (*Id.* at ¶ 104). On April 29, 2011, Raser filed for chapter 11 protection. (*Id.* at ¶ 105).

Plaintiffs allege that Raser's SEC filings were false and misleading in violation of Section 10(b) because defendants (1) failed to disclose that problems experienced with Thermo No. 1 were caused by inadequate "early well field development activities" and "poor well design," and that Raser's "rapid deployment" system was a "failure" (D.I. 14 at ¶ 62); (2) "lacked any reasonable basis" for their "expectation" that Thermo No. 1 would become operational at or near full capacity in the third quarter of 2009 (*id.* at ¶ 54); and (3) failed to recognize timely "impairment losses" for Thermo No. 1 and, thus, "overstated" its carrying value during the class period. (*Id.* at ¶¶ 57-58).

## II.   DISCUSSION

To state a claim for securities fraud under Section 10(b), a plaintiff must plead: (1) a material misrepresentation (or omission) in connection with the purchase or sale of a security; (2) scienter, *i.e.*, a wrongful state of mind; (3) reliance; (4) economic loss; and (5) "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). To survive a motion to dismiss, a plaintiff alleging securities fraud must satisfy Rule 8's requirement of factual allegations sufficient to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and the

3

"heightened pleading requirement[s]" imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b). *In re Suprema Specialties*, 438 F.3d at 276.

The purpose of the PSLRA is "'to restrict abuses in securities class-action litigation.'" *Id.* at 276 n.8 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999)). The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quotation omitted). The complaint must also allege, with particularity, facts giving rise to a "strong inference" that each defendant acted with scienter, that is, a "mental state embracing intent to deceive, manipulate, or defraud." 15 U.S.C. § 78-u4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotations omitted). In addition, the PSLRA "immunizes from liability any forward-looking statement" if it is "accompanied by meaningful cautionary language; or it is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009).

As a threshold matter, defendants argue that the Court must disregard or discount the sources on which the allegations in the amended complaint rely – information relayed to a confidential witness, allegations from a *qui tam* complaint, and an internet article. Turning first to the internet article, plaintiffs concede that it was written by an executive at a company currently in litigation with Raser over the subject matter of the article – the power generation units that the company sold to Raser for use in Thermo No. 1. (D.I. 14 at ¶ 42). This concession might suggest that the author has an incentive to disparage Raser and, at least, suggests that the

4

author does not have inside or personal knowledge of Raser's business strategy. The article was published in October 2011 – six months after Raser filed for bankruptcy. Hindsight, of course, is 20/20. The Court, thus, concludes that the article is not sufficiently "reliabl[e]" to meet the pleading requirements of the PSLRA. *See Tracinda v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 80 (D. Del. 2002) (discussing *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000) and stating that "articles can form the basis for adequate pleading under the PSLRA if they are sufficiently detailed to indicate their reliability and are based on an independent investigative effort."). Even if the article were sufficiently reliable and independent, the article itself does not suggest that defendants knew and were misrepresenting that Raser's business strategy was going to fail and, therefore, is insufficient to support allegations that defendants made fraudulent misstatements or omissions in Raser's SEC filings during the class period.

The *qui tam* complaint[2] is also an unreliable source. It is devoid of any information concerning the *qui tam* plaintiff's relationship to Raser or whether the plaintiff has firsthand knowledge of his allegations against Raser. As other courts in the Third Circuit have held, "it [is] not appropriate for the Court to give weight to the allegations in [a] *qui tam* case," *Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277578, at *2 (W.D. Pa. Sept. 29, 2011), because such allegations "are unproven and contested [and] do not amount to 'facts' sufficient to establish a strong inference of scienter." *In re Apollo Grp., Inc. Secs. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011).

---

[2] The government did not join in the *qui tam* complaint, and it was voluntarily dismissed. (D.I. 18, Ex. L). At oral argument, plaintiffs' counsel represented that the *qui tam* complaint has since been re-filed in the District of Columbia. (D.I. 24 at 60).

5

The allegations based on information from the confidential witness are also somewhat unreliable. In considering whether confidential witness allegations meet the particularity requirement of the PSLRA, courts must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (quotations and citation omitted). If the allegations do not demonstrate the confidential witness' reliability, the Court must "discount them steeply." *Id.*

The amended complaint alleges that the confidential witness held "a managerial position" at Raser during "part of 2008 and 2009." (D.I. 14 at ¶ 40). With only these general allegations, it is difficult for the Court to evaluate the reliability of the confidential witness. *See Cal. Publ. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004) (failure to allege dates of employment or how confidential witness acquired information was "problematic" because court was "left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor"). Furthermore, plaintiffs concede that the allegations are not based on the confidential witness' personal knowledge, but rather on information obtained by Michael Albrecht, a geophysicist then-employed by Raser, as relayed to the confidential witness. (D.I. 19 at 8). Although the Court need not decide the admissibility of any such testimony at this stage, *In re Schering-Plough Corp./Enhance Sec. Litig.*, 2009 WL 1410961, at *1 (D.N.J. May 19, 2009), the lack of sufficient description as to the confidential witness' employment at Raser as well as the fact that the allegations are not based on the confidential witness' personal knowledge mean that the Court must at least "steeply" discount allegations based on the confidential witness. *See Avaya*, 564 F.3d at 263.

6

Plaintiffs urge the Court to consider all three sources together as a whole because "accounts supplied by [multiple varied] sources corroborate and reinforce one another" and citing to those sources "help[s] provide particularity" as required under the PSLRA. *Chubb*, 394 F.3d at 155. Plaintiffs argue that "[t]he consistency of these [three] accounts reinforces the potential veracity of their allegations." *Sekuk Global Enters. v. KVH Indus.*, 2005 WL 1924202, at *7 (D. R.I. Aug. 11, 2005). As the Third Circuit has stated, however, "zero plus zero [plus zero] equals zero." *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011).

### A. Section 10(b) Claim

Plaintiffs contend that Raser's SEC filings were false and misleading because defendants failed to disclose that Raser did not "conduct any traditional and adequate early well field development activities" and, therefore, did not discover that "the temperature of the water from the Thermo No. 1 production wells was too low to operate the plant at maximum capacity," and that Raser's "rapid-deployment design and construction system was a failure." (D.I. 14 at ¶¶ 55, 62). Specifically, plaintiffs focus on the statement in Raser's first quarter 2009 10-Q that "[w]ith the completion of the major construction items of the Thermo No. 1 geothermal plant, we believe we have demonstrated our ability to quickly develop geothermal power projects using our rapid deployment business model." (*Id.* at ¶ 51). Plaintiffs allege that defendants "knew, or recklessly disregarded" that this statement was false and misleading because Raser's "rapid deployment business model" was "a failure." (*Id.*).

Plaintiffs' allegations do not state a Section 10(b) claim. Both before and during the class period, Raser disclosed to investors its "rapid deployment" strategy and specifically disclosed

7

that it may omit certain development steps where it concluded, "based on judgment, experience and available information," that development of a power plant was commercially viable. (D.I. 18, Ex. E). Raser's SEC filings also specifically disclosed the issues it faced during the development and launch of Thermo No. 1. (*See, e.g.*, D.I. 18, Ex. C at 41-43). These included the "delays and cost overruns" encountered during the process and the "key drivers" of those delays and overruns. (*Id.*). Raser also disclosed to investors the measures it took to analyze and improve the plant's output, cautioning that it could not be certain any of those efforts would "allow [it] to operate the Thermo No. 1 plant at full capacity." (*Id.*, Ex. D at 27). Here, the alleged omissions are contradicted by the company's public disclosures and, therefore, there can be no Section 10(b) claim. *See, e.g., In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed.").

Plaintiffs argue that defendants should have described their development strategy as a "failure" and based on "little more than intuition and stretched imagination." (D.I. 19 at 5). The law, however, does not require companies to frame their disclosures in such a pejorative manner. *See In re Craftmatic Sec. Litig.*, 890 F.2d 628, 639-40 (3d Cir. 1990) ("Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts.").

Plaintiffs also argue that "none of the Company's disclosures cure Defendants' simultaneous misleading statements that the problems encountered in the well development process 'could be remediated.'" (D.I. 19 at 5 (citing D.I. 14 at ¶ 8)). Neither this claim nor any facts supporting it are pleaded in the amended complaint. Even if they were, the allegations are

8

not sufficient to survive dismissal. Raser's SEC filings disclosed that its remediation efforts at Thermo No. 1 were successful to an extent, as output at the plant more than doubled between the second and third quarters of 2009. (D.I. 18, Ex. D at 27; D.I. 21, Ex. S at 26). Plaintiffs do not allege that these disclosures were false.

Accordingly, the Court concludes that plaintiffs have failed to allege any fraudulent statement or omission when considering the "total mix of information" available to investors. *Craftmatic*, 890 F.2d at 639-40 (quotations and citations omitted).

Plaintiffs also contend that the statement in Raser's first quarter 2009 10-Q about its "expectation that the Thermo No. 1 plant would become operational at, or near, full capacity early in the third quarter of 2009" was materially false and misleading because it lacked any "reasonable basis." (D.I. 14 at ¶ 54). This statement, however, is a forward-looking statement protected under the PSLRA's safe harbor because it was accompanied by meaningful cautionary language. In addition, plaintiffs fail to allege that any of the defendants had actual knowledge of its falsity.

Under the PSLRA, cautionary language immunizes forward-looking statements from liability if "substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (citations omitted). Raser's first quarter 2009 10-Q contained warnings in the "Risk Factors" section specifically addressing Raser's ability to operate Thermo No. 1 at full capacity. For example, the Risk Factors section specifically warned that "[t]he geothermal power production development activities of our Power Systems segment may not be successful." (D.I. 18 at 70). Raser explained:

9

> To date, we have placed one geothermal plant in service, and we continue to ramp up production of that plant. However, our ability to successfully complete that plant and develop additional projects *is uncertain*. Our success in developing a particular geothermal project is contingent upon, among other things . . . the timely implementation and satisfactory completion of construction. We *may be unsuccessful* in accomplishing any of these necessary requirements or doing so on a timely basis.

(*Id.*) (emphasis added). Raser also disclosed that "[a]lthough we are using [heat transfer] technologies in our Thermo No. 1 power plant, that power plant has only been operating for a short time. As a result, we cannot be certain that PWPS's heat transfer technologies or other vendors' heat transfer technologies can be successfully implemented." (*Id.* at 73).

This language provides clear warning about the operational risks Raser's Thermo No. 1 plant faced and meets the standards of the PSLRA's safe harbor. Accordingly, the Court concludes that plaintiffs have failed to state a claim under Section 10(b) with respect to Raser's statement about its expectation that the Thermo No. 1 plant would become fully operational in the third quarter of 2009.

Finally, plaintiffs allege that defendants failed to timely recognize "impairment losses" for Thermo No. 1 and thus "overstated" its carrying value during the class period. (D.I. 14 at ¶¶ 57-58). "[I]n order to sustain a claim for securities fraud based upon an alleged failure to write down an asset, the Complaint must go further than merely alleging with the benefit of hindsight that an impairment should have been taken to reflect a decline in fair market value." *In re Mirant Corp. Secs. Litig.*, 2009 WL 48188, at *22 (N.D. Ga. Jan. 7, 2009). Instead, "the Complaint must provide detail as to why an impairment was required under then-existing accounting rules."

10

*Id.* Specifically, the complaint must "detail how the results of an impairment test were reported fraudulently in the company's financial disclosures, or how impairment testing should have been conducted and how that testing would have necessarily required a recognition of an impairment." *Id.*

Statement of Financial Accounting Standards 144 ("FAS 144") "regulates the manner in which companies are to recognize 'impairments' of the value of long-lived assets reported in their financial statements." *Amalgamated Bank v. Coca-Cola Co.*, 2006 WL 2818973, at *14 (N.D. Ga. Sept. 26, 2006). "[W]hen changed circumstances affect the value of an asset, FAS [144] requires a company to . . . determine whether the current value reported on the books . . . exceeds the total amount of undiscounted future cash flows expected to result from the use and eventual disposition of the asset." *Id.* "Notably, once a company recognizes an impairment based on negative market conditions, it is not allowed to go back and 'restore' the asset if favorable market conditions cause value to increase." *Id.* at n.10.

Plaintiffs' Section 10(b) claim rests on the theory that the final write-down taken by Raser, which reduced the plant's value to $14.6 million, should have been recorded at the beginning of the class period, just a few months after the plant began operations. (D.I. 14 at ¶ 9). Plaintiffs, however, allege nothing in support of this claim.

Courts have held that plaintiffs cannot establish falsity by "seiz[ing] figures used in subsequent financial statements to show that the information should have been disclosed earlier." *In re K-Tel Int'l, Inc. Sec. Litig.*, 107 F. Supp. 2d 994, 1000 (D. Minn. 2000); *see also Chubb*, 394 F.3d at 163 ("We have long rejected attempts to plead fraud by hindsight."). The law is clear that "a delinquent write-down of the impaired assets, without anything more, does not state a

11

claim of securities fraud." *Glover v. DeLuca*, 2006 WL 2850448, at *25 (W.D. Pa. Sept. 29, 2006).

Accordingly, the Court concludes that plaintiffs have failed to state a Section 10(b) claim for statements concerning Raser's accounting for Thermo No. 1.

Plaintiffs also fail to adequately plead the requisite element of scienter. The amended complaint's scienter allegations are generalized and conclusory. For example, the allegations generally refer to "defendants" or "company executives." (*See, e.g.*, D.I. 14 at ¶¶ 6-8, 41, 43, 49, 52, 54-55, 115-117, 124, 127, 129, 131, 132, 135, 137). The Third Circuit has explicitly rejected such "group pleading" as incompatible with the PSLRA's requirement that plaintiffs "specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." *Winer Family Trust v. Queen*, 503 F.3d 319, 335-37 (3d Cir. 2007).

For the most part, the only allegations in which specific defendants are even identified are those that state the defendants' positions at Raser and who signed Raser's class period SEC filings or Sarbanes-Oxley certifications. (D.I. 14 at ¶¶ 21-31, 59, 66, 73, 81, 89, 95, 102). These types of allegations are insufficient to plead scienter. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("[A]llegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.") (quotations omitted); *Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 420 (D. Del. 2009) (Sarbanes-Oxley certifications do not support Section 10(b) liability where plaintiffs fail to "plead with sufficient particularity that [defendants

were] aware or should have been aware of" the alleged falsity "at the time those certifications were made").

Moreover, no fraud liability can exist against any defendant who was not a director or officer of Raser at the time of the challenged statement because they would not have had the required "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). Thus, the claims against defendants Goodman and Perry must be dismissed for alleged misstatements that were made before they joined Raser on January 25, 2010 and March 22, 2010, respectively. (D.I. 14 at ¶¶ 23, 25). Similarly, claims against defendants Cook, Petersen, Clayton, Perriton, and Higginson for alleged misstatements made after they stepped down from their positions at Raser on August 5, 2009, January 15, 2010, November 30, 2010, December 3, 2010, and February 11, 2011, respectively, must be dismissed. (*Id.* at ¶ 21; D.I. 18, Ex. N at 13; *id.*, Ex. O at 2; *id.*, Ex. P at 2).

Plaintiffs' allegations as to motive are similarly deficient because they fail to show "a concrete and personal benefit to the individual defendants resulting from [the alleged] fraud." *Avaya*, 564 F.3d at 278. Plaintiffs allege that "[d]efendants were motivated to delay recognizing the full impairment of Thermo No. 1 in order to secure a grant pursuant to Section 1603 of the Recovery Act," which "enabled Raser to repay approximately $30 million of the debt incurred in connection with the construction of Thermo No. 1." (D.I. 14 at ¶¶ 135, 137). Third Circuit law is clear, however, that actions that "reflect merely a general corporate desire to retire debt and raise funds" are insufficient to show motive by each of the defendants to commit securities fraud.

13

*Avaya*, 564 F.3d at 279. The amended complaint's allegations as to motive are insufficient to support an inference of scienter.

As discussed, plaintiffs also have not alleged that any defendants had actual knowledge of falsity for Raser's forward-looking "expectation that the Thermo No. 1 plant would become operational at, or near, full capacity early in the third quarter of 2009." (D.I. 14 at ¶ 54). The only allegation about any defendant's knowledge is based on the confidential witness' statement that a former employee informed defendant Petersen that a "revised well design" Raser developed "in June 2009" to address problems at Thermo No. 1 "would not work." (*Id.* at ¶¶ 45-46). The complained-of forward-looking statement, however, was contained in Raser's first quarter 10-Q issued May 11, 2009, before the alleged June 2009 communication by the former employee. (*Id.* at ¶ 51).

Plaintiffs' allegations as to accounting violations also fail to support a strong inference of scienter. Raser's impairment analysis inherently involved business judgment, *Amalgamated Bank*, 2006 WL 2818973, at *14 n.10, and therefore, plaintiffs' allegations about Raser's impairment analysis "do not involve misstatements or omissions of material fact, but rather a misstatement regarding [Raser's] opinion." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). Plaintiffs have not alleged that defendants "deliberately misrepresented a truly held opinion." *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at * 13 (S.D.N.Y. Sept. 19, 2011). Plaintiffs' accounting allegations primarily rely on the confidential witness' description of statements by a former Raser employee to defendant Petersen concerning Thermo No. 1's valuation. (*See, e.g.*, D.I. 14 at ¶ 47). The amended complaint, however, does not allege that the former employee was "privy to [Raser's] bookkeeping

14

practices, let alone the specific accounting [concerning Thermo No. 1] that went into the company's financial reporting." *Chubb*, 394 F.3d at 152.

Accordingly, the Court concludes that plaintiffs have failed to adequately plead scienter.

The Court turns now to defendants' argument that plaintiffs fail to adequately allege loss causation, a required element of a Section 10(b) claim. To state a claim for securities fraud under Section 10(b), the plaintiff must plead that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). "An inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* Thus, "to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir.2007) (citing *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184-85 (3d Cir. 2000)).

Plaintiffs present two alternative theories to establish loss causation. First, plaintiffs urge this Court to adopt the "materialization of risk" test. (D.I. 19 at 19). Alternatively, plaintiffs argue that the impairment charges taken together constitute a corrective disclosure that the rapid deployment plan was a failure. (D.I. 24 at 70-75). Under either theory, plaintiffs fail to adequately allege loss causation.

Under the "materialization of risk" test, "a plaintiff must show that the defendant exposed him to an undisclosed risk that subsequently materialized and that the materialization of the risk resulted in the complaint of loss." *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 966 (D. Ind. 2007); *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 n.1 (2d

15

Cir. 2006); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) ("That the true extent of the fraud was not revealed to the public ... until after Parmalat shares were worthless ... is immaterial where, as here, the risk allegedly concealed by defendants materialized ... and arguably caused the decline."). The Third Circuit has not adopted the "materialization of risk" test but, instead, requires that there have been corrective disclosures that exposed the alleged fraud. *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 563 n.35 (D.N.J. 2010); *see also Glover v. DeLuca*, 2006 WL 2850448, at *33 (W.D. Pa. Sept. 29, 2006). Thus, the absence of any allegation of a corrective disclosure warrants dismissal. *See In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005); *see also Nat'l Junior Baseball League*, 720 F. Supp. 2d at 561 (plaintiff failed to plead loss causation where "none of the announcements made by Defendants mention any alleged fraudulent practices.").

Even if this Court adopted the "materialization of the risk" test, plaintiffs have not alleged an undisclosed risk that materialized and caused plaintiffs harm. As discussed, Raser disclosed the risk that Thermo No. 1 might never operate at capacity and, therefore, might not be profitable. Thus, plaintiffs' theory under the materialization of risk test fails because "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

Plaintiffs' argument that the impairment charges taken together constitute corrective disclosure also fails. Over 98% of the decline in Raser's stock price during the class period occurred before the first impairment charge was taken. (*See* D.I. 18, Ex. R). Thus, the purported corrective disclosure could not have been a substantial factor in causing any class member's

16

alleged damages. *See Schleicher v. Wendt*, 2005 WL 1656871, at *4 (S.D. Ind. July 14, 2005) (dismissing claims under *Dura* where "[t]he stock had long since hit bottom before these alleged misrepresentations became known.").

### B.   Section 20 Claim

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Plaintiffs' Section 20(a) claim must also be dismissed because the Amended Complaint fails to allege a primary Section 10(b) violation by Raser or any defendant.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss. (D.I. 16). The Court believes any amendment is likely futile, but cannot completely rule out that plaintiffs could amend the amended complaint to overcome the numerous and substantial shortcomings the Court has identified in the amended complaint. Thus, the Court will allow two weeks from the date of this opinion for plaintiffs to file a motion for leave to amend the amended complaint. Should the plaintiffs not file such a motion, the Court will enter an order dismissing with prejudice the amended complaint.